711 F.2d 1510
 MEKDECI, David, an infant, By and Through Michael and
Elizabeth MEKDECI, his natural guardians, and
Michael and Elizabeth Mekdeci,
Individually, Plaintiffs-
Appellants, Cross-Appellees,
v.
MERRELL NATIONAL LABORATORIES, A DIVISION OF
RICHARDSON-MERRELL, INC., a Delaware Corporation,
Defendant-Appellee, Cross-Appellant.
 No. 81-5625.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 15, 1983.
 
 J. Douglas Peters, John N. Markwick, Adrienne G. Southgate, Detroit, Mich., for plaintiffs-appellants, cross-appellees.
 Lawrence E. Walsh, Oklahoma City, Okl., Davis, Polk & Wardwell by Guy Miller Struve, Ogden N. Lewis, Miriam G. Cedarbaum, Lynn E. Burath, Diane Krejsa, New York City, Gurney, Gurney & Hadley by Leon H. Handley, Orlando, Fla., for defendant-appellee, cross-appellant.
 Appeals from the United States District Court for the Middle District of Florida.
 Before FAY, HENDERSON and HATCHETT, Circuit Judges.
 ALBERT J. HENDERSON, Circuit Judge:
 
 
 1
 The plaintiffs-appellants, Michael and Elizabeth Mekdeci and their infant son David, appeal the judgment of the United States District Court for the Middle District of Florida entered on a jury verdict for the defendant, Merrell-National Laboratories (Merrell), in this diversity products liability action. They allege several errors, primarily procedural, growing out of the lengthy proceedings in this case. Additionally, Merrell filed a cross-appeal, urging that the trial court erroneously denied its motions for directed verdict and for judgment notwithstanding the verdict. After careful consideration of the parties' various contentions, we affirm the judgment on direct appeal and dismiss the cross-appeal as moot.
 
 I.
 
 2
 In 1975, Elizabeth Mekdeci gave birth to a son, David. The child suffered from a combination of birth defects, which included malformed and missing fingers and a missing pectoral muscle. Thereafter, she extensively investigated the possible origin of her son's injury and became convinced that a drug she had ingested for nausea during the pregnancy was the cause. That drug, Bendectin, is manufactured by the defendant.
 
 
 3
 Based on that conclusion, the Mekdecis, both individually and on behalf of their son, instituted the present suit against Merrell. In their complaint, they alleged Florida causes of action for strict liability, negligence, breach of warranty and fraud. At the end of a two month trial, the jury appeared to be deadlocked in its deliberations. The district court gave the jury further instruction, and soon afterward, the jury returned a verdict awarding the "plaintiff" $20,000.00, the amount stipulated by the parties as compensation for the parents' medical expenses. The verdict, however, denied any recovery on the child's individual cause of action. For that reason, the plaintiffs sought a new trial limited to a determination of damages. Declaring the jury's award to be a compromise verdict, the district court ordered a new trial on all issues.
 
 
 4
 Prior to the second trial, the plaintiffs' attorneys made several unsuccessful attempts to withdraw as counsel for the Mekdecis and to obtain a continuance. The second trial proceeded as scheduled and resulted in a verdict absolving the defendant of all liability. The district court entered a judgment in conformance with the verdict and taxed the costs incurred by Merrell in both trials against the plaintiffs. This appeal, and the accompanying cross-appeal, followed.
 
 II.
 
 5
 In their initial assignment of error, the Mekdecis assert that following the first trial, the district court abused its discretion by ordering a new trial on all issues, instead of an adjudication solely for the purpose of assessing the amount of the infant's damages. More specifically, they argue that the original verdict definitively established liability and that forcing them to litigate that issue again placed an unfair burden on them. The defendant, on the other hand, suggests that the district court correctly characterized the verdict as an improper compromise, thereby necessitating a complete new trial.
 
 
 6
 Of course, a district court's disposition of a motion for a new trial is discretionary, and absent an abuse of that discretion, its decision will not be disturbed on appeal.[1] See, e.g., Williams v. City of Valdosta, 689 F.2d 964, 974 (11th Cir.1982); Lucas v. American Manufacturing Co., 630 F.2d 291, 293 (5th Cir.1980).[2] Fed.R.Civ.P. 59(a) authorizes a trial court to grant a new trial "to all or any of the parties and on all or part of the issues ... for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Traditionally, an inadequate award of damages may constitute a sufficient reason to set aside a jury verdict. See, e.g., Lucas, 630 F.2d at 293; see also C.A. May Marine Supply Co. v. Brunswick Corp., 649 F.2d 1049, 1053 (5th Cir.), cert. denied, 454 U.S. 1125, 102 S.Ct. 974, 71 L.Ed.2d 112 (1981).
 
 
 7
 While Rule 59 permits a limited retrial on damages in that instance, a partial new trial is appropriate only in certain circumstances. As the Supreme Court has instructed,
 
 
 8
 [w]here the practice permits a partial new trial, it may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice.
 
 
 9
 Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188, 1191 (1931); see also Lucas, 630 F.2d at 294. In accordance with that mandate, this court has required a complete new trial "when the issues of liability and damages were tried together and there are indications that the jury may have rendered a compromise verdict." Lucas, 630 F.2d at 294; see also Hatfield v. Seaboard Air Line Railroad Co., 396 F.2d 721, 724 (5th Cir.1968); see generally J. Moore, 6A Moore's Federal Practice p 59.06 (2d ed. 1979).
 
 
 10
 A compromise verdict results when jurors resolve their inability to make a determination with any certainty or unanimity on the issue of liability by finding inadequate damages. See Freight Terminals, Inc. v. Ryder System, Inc., 461 F.2d 1046, 1053 (5th Cir.1972). However, an insufficient damages verdict, standing alone, does not necessarily indicate a compromise. See, e.g., Hadra v. Herman Blum Consulting Engineers, 632 F.2d 1242, 1246 (5th Cir.1980), cert. denied, 451 U.S. 912, 101 S.Ct. 1983, 68 L.Ed.2d 301 (1981). Parker v. Wideman, 380 F.2d 433, 437 (5th Cir.1967). Ordinarily there must be other evidence demonstrating that the deficient monetary award resulted from an impermissible compromise. Compare Lucas, 630 F.2d at 293-94, and Hatfield, 396 F.2d at 723-24, with Hadra, 632 F.2d at 1246. If sufficiently persuasive indicia of a compromise are present, then the issues of liability and damages are inseparable and a complete new trial is necessary. See Lucas, 630 F.2d at 293-94; Hatfield, 396 F.2d at 723-24.
 
 
 11
 For example, in Lucas, the court reviewed a jury verdict finding the defendant liable, but awarding the plaintiff damages less than the minimum amount stipulated by the defendant. 630 F.2d at 292. Because of an approaching hurricane, the district court admonished the jury either to finish their deliberations within a brief period of time or to return on a later date. Id. at 293. In the view of the appellate court, the risk that this coercion produced the inadequate relief necessitated a new trial. Id. at 293-94. Additionally, believing that those same considerations may have led to a jury compromise, the court ordered a new trial on all issues. Id. at 294.
 
 
 12
 The court in Hatfield employed similar reasoning to reach an identical result. There, the jury returned a verdict against the defendant on liability, but assessed the plaintiff's damages at one dollar. 396 F.2d at 722. On appeal, the court required a new trial on both liability and damages. Id. at 723-24. Like the panel in Lucas, the court concluded that the same factors that necessitated a new trial also suggested that the verdict was a compromise, thereby dictating that the retrial encompass all issues. Id. at 724. The particular circumstances compelling that conclusion were
 
 
 13
 that the issues of liability were strongly contested, that there was some confusion on the part of the jury with regard to the contributory negligence issue, that the jury took two days to reach a verdict, and that neither party urged acceptance in the trial court of the verdict finally rendered.
 
 
 14
 Id. at 723.
 
 
 15
 Mindful of these principles, we turn to an examination of the record in this case. First, the verdict itself tends to support the plaintiffs' original contention that the jury's damage award was inadequate. In the blank space for designating the prevailing party, the jury merely marked "Plaintiff," without differentiating between the respective claims of the parents and the child. The jury then left unchanged the next paragraph of the verdict form, which reflected the parties' stipulation of the amount of the expenses, $20,000.00, incurred by the parents as a result of the injury. Nevertheless, the jury wrote "Nothing" in the third paragraph as the amount of compensatory damages due the child individually. The final portion of the verdict calling for punitive damages was left blank. Thus, although the defendant never disputed the child's damages, only the allegation that its product caused the injury, the jury denied the infant any compensatory relief, limiting the damages to items recoverable by the parents on their derivative claim.[3] Based on the uncontroverted evidence of David Mekdeci's damages, the district court correctly held that the award was inadequate.
 
 
 16
 Still, as previously noted, the insufficiency of the compensatory verdict by itself does not automatically establish an improper compromise, which would eliminate the possibility of a partial retrial limited to an assessment of damages. However, the sequence of events leading up to that verdict furnishes ample additional evidence to sustain the district court's conclusion that it reflected a compromise. The trial judge initially submitted the case to the jury on Monday, March 17, 1980. During the next few days, the jury sent several communications to the judge indicating its uncertainty on the central issue of causation.[4] On Thursday of that week, the jury sought the district court's permission to render a verdict with an explanation of its reasons.[5] Only thirty minutes after the court denied that request, the jury sent word that it was "hopelessly deadlocked." The judge then gave a modified Allen charge instructing the jury to continue its deliberations.[6] The following day, the jury returned the verdict.
 
 
 17
 Several facets of this episode suggest a compromise. First, the jury took four days to reach a verdict. Cf. Hatfield, 396 F.2d at 723 (emphasizing that jury deliberated for two days). Moreover, the parties "strongly contested" the issue of liability. See Hatfield, 396 F.2d at 723. In fact, the jury's communications with the judge during the deliberations revealed its focus on that central controversy. Even more indicative, however, is the fact that the jury attempted to qualify its verdict. The effort to explain their verdict, coupled with the announcement of a deadlock soon after the judge denied the request, reinforces the notion that the jurors could not reach an agreement on the substantive issues. Finally, in light of these developments, the Allen charge may have had the unintended effect of compelling a compromise.
 
 
 18
 Taken together, these unique circumstances provide abundant indicia that the jury compromised the issues of liability and damages, therefore rendering them inseparable. When viewed in this context, any other explanation for the inadequate damage award is unpersuasive. On that basis, the district court certainly acted within its discretion when it ordered a new trial on all issues, rather than a partial retrial limited to a determination of damages.[7] In short, we find no abuse of discretion.III.
 
 
 19
 The plaintiff's next assignment of error involves the persistent efforts of their original lawyers to withdraw as counsel for the Mekdecis. During the nine month interim between the two trials, the six attorneys of record made various attempts to abandon the case and, failing that, to obtain a continuance. Finding no compelling justification for the lawyers' requests, the district court denied the motions. In addition, the court refused to grant the six month continuance requested by another law firm, who sought to replace the recalcitrant attorneys but conditioned their entry into the case on the court's willingness to delay the proceedings. On appeal, the plaintiffs attack those rulings and urge that the presentation of their case by unwilling counsel deprived them of a fair trial.
 
 A.
 
 20
 The events giving rise to these allegations present an extraordinary tale. The story begins with the extensive efforts of Mrs. Mekdeci, following the birth of her son, to discover the possible cause of his defects. During the course of her investigation, she talked with many medical experts and examined numerous documents, including government studies of Bendectin. After several years, she collected sufficient information to convince her that the drug had caused David's injury. At that point, she contacted Melvin Belli in San Francisco about legal representation. Belli reviewed the materials she had assembled, and then consented to accept the case.
 
 
 21
 The agreement with Belli evidently called for him to serve as trial counsel. He also referred the Mekdecis to a Florida attorney, Gerald Tobin. Tobin brought in one of his associates, Arthur Tifford, as well as two other local attorneys, Arthur Cohen and George Kokus. The arrangement contemplated that Tobin and Tifford would handle the pleadings and paperwork, that Cohen and Kokus would orchestrate the discovery, and that Belli would conduct the trial. A trial date was originally set for July, 1979. Apparently at Belli's request, the district court granted a continuance until January, 1980. However, just several weeks before the scheduled date, Belli informed the Florida attorneys that he would not appear as counsel. Consequently, the other lawyers, with the assistance of Allen Eaton, a Washington, D.C. attorney specializing in food and drug regulation, prepared to litigate the case themselves.
 
 
 22
 At a May hearing following the first trial, the judge (Senior Judge Walter Hoffman of the Eastern District of Virginia, sitting by designation) informed the parties that the second trial would begin in January, 1981. During that spring, Belli and several of the Florida attorneys capitalized on the claimed victory in the first trial in a rather obvious effort to attract other Bendectin clients. They traveled both in this country and Europe, trumpeting their participation in that trial and advertising for Bendectin mothers to contact them, ostensibly for statistical studies. Although the record does not reveal the exact number of cases they have obtained, it is clear that the attorneys now represent plaintiffs in numerous Bendectin cases, presumably as a result of this publicity.
 
 
 23
 In the summer of 1980, the first signs appeared that the lawyers might be abandoning the Mekdecis. The London Observer quoted Belli as saying that Mrs. Mekdeci was too difficult to work with, that her case was not that strong, and that he was turning his attention to two hundred similar cases. About the same time, on July 24, 1980, all of the attorneys of record moved to withdraw, citing an alleged "irreconcilable conflict" with the clients as the basis for the motion. The district court held a hearing on the matter on July 29, 1980 (Chief Judge George Young of the Middle District of Florida, who was scheduled to preside at the second trial, joined Judge Hoffman in this hearing). There, Mrs. Mekdeci disclosed her complete surprise over the attorneys' motion as well as the allegation of an irreconcilable conflict. She denied any such disagreement. The court postponed any resolution of the issue so that the attorneys could apprise the Mekdecis of their reasons for seeking withdrawal. Nevertheless, Judge Hoffman informed the plaintiffs that they had three alternatives if counsel was ultimately allowed to withdraw: (1) obtain successor counsel, (2) represent themselves, or (3) dismiss the action.
 
 
 24
 During the next hearing on August 11, 1980, the Mekdecis appeared with two attorneys from a Detroit firm, Charfoos, Christensen, Gilbert and Archer (Charfoos). Those lawyers expressed their potential interest in taking over the case and requested an opportunity to first review the files. Chief Judge Young readily agreed to allow them to study the files. In a discussion about the withdrawal motion, Mrs. Mekdeci revealed, again to the court's surprise, that her attorneys had not contacted her to explain the reasons for their request, contrary to the court's instructions at the earlier hearing.[8] The court deferred a final decision until the Charfoos firm decided if it would assume representation. The court also ordered Cohen to submit a detailed outline of the reasons for the withdrawal motion.
 
 
 25
 On August 29, 1980, the district court (with Judge Hoffman and Chief Judge Young presiding jointly) again convened to consider the matter. One of the Detroit lawyers, Douglas Peters, reported the results of his firm's review. He explained to the court the two conditions his firm would require satisfied before accepting the case: (1) judicial mediation of the large cost lien imposed by the other attorneys, and (2) a six month continuance essentially to enable them to implement a different trial strategy.[9] The judges carefully explored the additional discovery the Detroit firm was contemplating and even offered to arrange the deposition dates to facilitate a timely schedule. When the attorney adhered to his firm's demand, the court declared the asserted reasons insufficient to justify a continuance. Charfoos, through Peters, then declined to accept the case.
 
 
 26
 After denying the continuance, the court turned to a consideration of the motion to withdraw. In the letter of explanation requested earlier by the court, the attorneys basically cited differences of opinion between them and the Mekdecis over trial strategy. The Mekdecis informed the court that they did not consider the disagreements insurmountable, that they were willing to cooperate fully with the lawyers, and that they wished to continue with their original attorneys. Mrs. Mekdeci also suggested that the real dispute centered on her reluctance to acquiesce in the attorneys' preference to delay the trial until after the trial of another Bendectin case. Based on the plaintiffs' assurances, the district court denied the motion to withdraw, admonishing all of the parties to work together toward their common purpose.
 
 
 27
 The court's order did not even momentarily deter the attorneys' attempts to extricate themselves from the case. Less than a month later, Cohen, Kokus, Tifford and Eaton renewed their motion to withdraw. They based the request on the same conclusory allegation of an "irreconcilable conflict." They also emphasized that their motion did not include Belli, therefore leaving him to represent the plaintiffs.[10] The Mekdecis again opposed the motion. In a brief order, the district court denied the request, observing that
 
 
 28
 [g]ood grounds have not been shown as to why it would be in the interest of justice for this Court to permit the Florida attorneys (Cohen, Kokus and Tifford) and the Washington, D.C. attorney, Allen, [sic] to abandon the plaintiffs to rely upon a California attorney who has not actively participated in this case, nor indicated a firm resolve to do so, and further, who is reported to have stated that he has no further interest in the case.
 
 
 29
 Mekdeci v. Merrell National Laboratories, Inc., No. 77-255 (M.D.Fla. Sept. 26, 1980) (order denying motion to withdraw). The attorneys then petitioned the former Fifth Circuit for a writ of mandamus. The writ was denied. In re Cohen and Kokus, No. 80-5839 (5th Cir. Nov. 13, 1980).
 
 
 30
 Even the district court's adherence to its original ruling and the Fifth Circuit's denial of extraordinary relief did not end the attorneys' maneuvers. On December 31, 1980, less than one month before the scheduled trial date, the attorneys renewed their request still again, this time in alternative motions to withdraw, for a continuance or for a stay of proceedings pending the disposition of their appeal.[11] For the first time, they suggested that they lacked sufficient funds to finance the costs of the second trial. The court held a hearing on January 12, 1980 to consider those motions. During that hearing, Kokus asserted every conceivable basis for delaying the proceedings. He primarily attempted to convince the court that extensive discovery remained to be accomplished and that the lawyers could not afford a retrial at that time. The court noted the complete absence of any proof substantiating the lawyers' alleged inability to advance costs. Moreover, while acknowledging that her family could not cover the expenses, Mrs. Mekdeci expressed her disbelief of the allegation and her determination to obtain funds to assure the presence of their chief expert witness. She also emphasized her preference to proceed to trial as scheduled, if at all possible.
 
 
 31
 The court also observed that the attorneys' assertions appeared to contradict their position in another Bendectin case pending in the United States District Court for the District of Columbia. During a hearing held only a month earlier in that case, Eaton urged that court to set a trial date as early as June. (Here, they moved for a continuance at least until October). Merrell's attorney protested that the intervening Mekdeci trial might make it impossible to complete discovery in the other case by June. In a statement that perhaps shed more light than intended on the attorneys' motivations in the Mekdeci case, Eaton recounted numerous problems in the Mekdeci lawsuit and said,
 
 
 32
 that being the case, we have a group of people--a group of attorneys who have agreed that, in order to start afresh and develop the issues properly, that the Koller case in our opinion represents perhaps the cleanest case of all the cases and the clearest one.
 
 
 33
 We have a nurse here who ingested Bendectin, and only Bendectin. She ingested it during the critical period. And little Anne Koller has no arms and she has only a left leg which has a club foot on it.
 
 
 34
 We figure this was a clear case in order to litigate the issues properly.
 
 
 35
 Koller v. Richardson-Merrell, Inc., No. 80-1258, (D.D.C. filed May 19, 1980) (Hearing on Dec. 3, 1980).
 
 
 36
 Even though they urged an early trial date in Koller, the attorneys adhered to their contention that they could not afford a trial in the Florida case. In fact, they threatened the court that they would not present any live witnesses if they were unable to procure a continuance. Still, based on all of the circumstances and the plaintiffs' desire to proceed, the district court denied the request.
 
 
 37
 The second trial was the final chapter in this saga. The attorneys to some extent made good their threat, at least initially, by offering an essentially "paper" case. Midway through the proceedings, Belli sent $25,000.00 for use to pay the expenses of several live witnesses. In any event, the two witnesses which the plaintiffs primarily relied upon in the first trial did not appear in person. Several weeks into the trial, the district court learned of the brief filed by Peters, on behalf of the Mekdecis, in the attorneys' appeal pending before the Fifth Circuit Court of Appeals. That brief suggested that the trial court erred in its handling of the lawyers' repeated motions, especially in the refusal to grant the last request for a continuance. Chief Judge Young was amazed, to say the least, over the plaintiffs' position, since they had consistently conveyed their preference to proceed with the trial. The court also expressed concern that completion of the trial might be futile if both the Mekdecis and the attorneys viewed the prior rulings as erroneous. After consulting with Peters, Mrs. Mekdeci relayed to the court a message from the Detroit lawyers: "[w]e stand by the concerns we stated in our brief, but as of the date of the filing of that brief, no live witnesses had been called. Since live witnesses have been called, we would like to continue forward." Based on that representation, Judge Young resumed the trial. In spite of that assurance, in the present appeal, the Mekdecis have returned to their original stand that disturbed the district court.
 
 B.
 
 38
 We turn initially to the plaintiffs' contention that the district court erred in denying the six month continuance requested by the Charfoos firm as a condition to its entry into the case. The disposition of such a motion lies within the sound discretion of the trial court. See, e.g., Rhodes v. Amarillo Hospital District, 654 F.2d 1148, 1153 (5th Cir.1981). In reaching its decision, the district court here carefully considered the asserted need for additional time to permit successor counsel to prepare for the trial, the desire of the original attorneys to withdraw, and the interests of the defendant, as well as the court, in proceeding with the trial as scheduled. After reviewing the balance struck by the district court, we conclude that the court did not abuse its discretion in refusing the request.
 
 
 39
 Of greatest significance, the trial court determined that new counsel could adequately prepare for the case in the five months remaining before the scheduled trial date. To justify the request for a six month delay, the Detroit lawyers outlined the different strategy they would undertake and the further discovery they viewed as necessary. In discounting that representation, the court emphasized that the bulk of any necessary preparation was an accomplished fact. The suit had been tried once and a complete transcript of those proceedings was available to the Charfoos firm. Moreover, the district court offered to assist in arranging the deposition dates itself, in an effort to expedite the completion of any additional discovery within the five month period. In short, the record demonstrates that the court both meticulously appraised the purported justifications for a continuance and expressed its willingness to aid in the completion of any further discovery. Having presided at the first trial, Judge Hoffman was in a more advantageous position to assess the validity of the attorneys' claim for more time. By comparison, "[w]e ... are in a poor position to weigh its validity." See Rhodes, 654 F.2d at 1153.
 
 
 40
 Furthermore, once the district court determined that successor counsel had sufficient time to make adequate preparations, it faced other considerations militating against giving the Charfoos firm carte blanche in choosing its trial date. Not only did the defendant have a substantial interest in a prompt adjudication on the safety of its product, but the court had legitimate concerns of its own. Any delay in the proceedings would have drastically disrupted the calendar of the district court. The date for the second trial had been set more than eight months in advance. The mere act of scheduling a case of such magnitude had proven to be an enormous task for the court. Faced with an extremely crowded docket under ordinary circumstances, the Middle District of Florida lacked the judicial manpower to undertake a two month civil trial with its own resources. Thus, Chief Judge Young had to arrange for visiting judges to handle the regular caseload while he presided at the second trial. As the district court recognized, the cancellation of these arrangements would have placed an extraordinary burden on the court.
 
 
 41
 Still, we agree with the plaintiffs that "the interests in favor of a fair trial [generally outweigh] the interests in favor of an immediate trial." See Smith-Weik Machinery Corp. v. Murdock Machine and Engineering Co., 423 F.2d 842, 844 (5th Cir.1970). Here, though, the district court determined that successor counsel could provide competent representation within the existing time constraints. In effect, the Charfoos firm presented the trial court with an unconditional demand. Under the circumstances of this case, the district court did not abuse its discretion in refusing to accede to that demand.[12]
 
 C.
 
 42
 After the district court denied the motion for a continuance, the Mekdecis consistently urged the court to reject the various requests by their original attorneys to withdraw from the case. Nonetheless, they now argue in this appeal that the district court erred in not granting the motion permitting the lawyers to withdraw. To justify this change in position, the plaintiffs suggest that they only opposed the motions in the trial court because that court erroneously denied a continuance for successor counsel, therefore placing them in the predicament of choosing between retaining their reluctant counsel or facing trial with the possibility of no representation. However, because we find that the district court acted within its discretion by refusing a continuance, we conclude that the choice presented them was proper. Thus, the only remaining question is whether compelling ethical considerations mandated withdrawal from the case regardless of the clients' stated preference to keep their attorneys.
 
 
 43
 Local Rule 2.03(b) of the United States District Court for the Middle District of Florida prohibits the withdrawal of counsel without the court's approval. Additionally, Local Rule 2.03(c) states that the court will not grant permission "absent compelling ethical considerations, if such withdrawal would likely cause continuance or delay." In this court, the plaintiffs advance two reasons why withdrawal was purportedly mandated under the Code of Professional Responsibility,[13] which, if true, would obviously constitute "compelling ethical considerations" under the Local Rule.
 
 
 44
 First, they maintain that the attorney-client relationship was indeed plagued by an "irreconcilable conflict."[14] This allegation directly contradicts their repeated assurances to the district court that such enmity did not exist. Moreover, the record does not support such a claim. As the representations of Mrs. Mekdeci and the lawyers to the district court illustrated, their past disagreement basically centered on strategic choices made at the first trial. Even the lawyers admitted that Mrs. Mekdeci had professed general satisfaction with their performance at the first trial. At the time they sought to be excused from the case, their only apparent dispute with the plaintiffs concerned Mrs. Mekdeci's refusal to acquiesce in their desire to obtain a continuance. Such a difference of opinion, standing alone, falls far short of establishing an irreconcilable conflict. As the former Fifth Circuit Court of Appeals has recognized,
 
 
 45
 [a] client by virtue of a contract with his attorney is not made an indentured servant, a puppet on counsel's string, nor a chair in the courtroom. Counsel should advise, analyze, argue, and recommend, but his role is not that of an imperator whose edicts must prevail over the client's desire.
 
 
 46
 Singleton v. Foreman, 435 F.2d 962, 970 (5th Cir.1970).[15] The record does not contain evidence of a conflict in the attorney-client relationship of such proportions as would require an ethically-mandated withdrawal of counsel.
 
 
 47
 The plaintiffs next allege that the attorneys had an improper financial stake in the outcome of the second trial, which ethically precluded their continued representation under D.R. 5-101 and 5-103. They claim that the lawyers' obligation to advance costs created such an unlawful proprietary interest. To the contrary, D.R. 5-103(B) specifically states that "a lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence, provided the client remains ultimately liable for such expenses." Hence, the attorneys' initial responsibility for trial expenses does not amount to a mandatory ground for withdrawal.[16]
 
 
 48
 In summary, the plaintiffs' lawyers did not present the court with any compelling ethical consideration demanding their withdrawal. Absent such a reason, the district court had the discretion to deny the withdrawal motion. Cf. Broughten v. Voss, 634 F.2d 880, 882-83 (5th Cir.1981) (before granting such a motion, "it is incumbent on the court to assure that the prosecution of the lawsuit before it is not disrupted by the withdrawal of counsel, and that the withdrawal of counsel is for good cause.")[17] When making its decision, the district court faced the emphatic insistence of the plaintiffs that it deny the withdrawal motion.[18] The Mekdecis cannot now complain that the district court erred by assenting to their wishes.
 
 D.
 
 49
 Underlying each of the plaintiffs' specific contentions pertaining to the attorneys' conduct is their belief that counsel ultimately performed ineffectively at the second trial. Essentially, the fundamental premise of their argument is that they were denied a fair trial, in violation of their right to due process, because of the alleged inadequacy of the representation. Based on that perception, they suggest that the prejudice which purportedly resulted therefrom renders the trial court's rulings on the motions for a continuance and for withdrawal erroneous. While we are not unsympathetic, we find a critical flaw in their reasoning.
 
 
 50
 In effect, the plaintiffs assume that they have a protected right to competent representation in their lawsuit. Simply stated, however, "there is no constitutional or statutory right to effective assistance of counsel on a civil case."[19] Watson v. Moss, 619 F.2d 775, 776 (8th Cir.1981); see also United States v. White, 589 F.2d 1283, 1285 n. 4 (5th Cir.1979); United States v. Rogers, 534 F.2d 1134, 1135 (5th Cir.), cert. denied, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976); In Re Grand Jury Matter, 682 F.2d 61, 66 (3d Cir.1982); Kushner v. Winterthur Swiss Insurance Co., 620 F.2d 404, 408 (3d Cir.1980). The sixth amendment standards for effective counsel in criminal cases do not apply in the civil context. White, 589 F.2d at 1285 n. 4; Rogers, 534 F.2d at 1135; Watson, 619 F.2d at 776; for that reason, "[a] party ... does not have any right to a new trial in a civil suit because of inadequate counsel, but has as its remedy a suit against the attorney for malpractice." Watson, 619 F.2d at 776; see also Kushner, 620 F.2d at 408.
 
 
 51
 Our conclusion in no way suggests that we condone the conduct of the plaintiffs' original attorneys. On the contrary, we agree that the present record raises disturbing questions on the propriety of the lawyers' actions. The attorneys' various antics create the impression that they may have been more concerned with bettering their position in other Bendectin cases, rather than with fulfilling their professional responsibilities to the Mekdecis, who ironically made it possible for the lawyers to obtain the other cases in the first place. Additionally, there are indications that several, if not all, of the attorneys may have breached their contractual obligations to the plaintiffs. Consequently, we do not necessarily discount the Mekdecis' claim that they have been aggrieved by the conduct of their lawyers.
 
 
 52
 Still, their remedy does not lie in this appeal. The possible failure of the lawyers to fulfill their professional duties creates a dispute between the Mekdecis and them distinct and independent from the plaintiffs' cause of action against Merrell. Absent an erroneous ruling by the district court in its dealings with the parties, the attorneys' conduct is not a ground for reversing the judgment in the original action. Thus, the Mekdecis must seek relief by means of the remedies specifically designed to compensate the type of injury they allege. Our decision in this appeal does not eliminate their right to pursue relief in the appropriate forum.
 
 IV.
 
 53
 The plaintiffs' final assignment of error challenges the district court's order, entered pursuant to Fed.R.Civ.P. 54(d), assessing against them the costs incurred by Merrell in both trials. In its present status, however, the order is nonappealable. Appellate jurisdiction is limited to final decisions of the district court. See 28 U.S.C. § 1291; Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1948). Here, the order in controversy is not final. While the district court has announced its intention to award costs to Merrell, it has yet to fix the amount. As a result, "the order on its face contemplated further proceedings before the [plaintiffs'] ultimate obligations regarding the costs ... became fixed." SEC v. Independence Drilling Corp., 595 F.2d 1006, 1008 (5th Cir.1979); cf. Williams v. Ezell, 531 F.2d 1261, 1263 (5th Cir.1976) (order awarding attorneys fees, but postponing determination of amount, is not final). Accordingly, we lack jurisdiction to review the order at this juncture.
 
 V.
 
 54
 Merrell filed a cross-appeal contesting the district court's denial of its motions for a directed verdict in both trials and the request for a judgment notwithstanding the verdict in the first trial. The defendant says that the plaintiffs failed to present sufficient evidence to create a jury question on the issue of proximate cause.[20] However, our disposition of the Mekdecis' appeal has the effect of affirming the jury verdict in the second trial, which absolved Merrell of liability in this action. Thus, the district court's error, if any, in denying the requested motions is a moot question.[21] Cf. Welch v. Outboard Marine Corp., 481 F.2d 252, 257 (5th Cir.1973); Richardson v. American Motorists Insurance Co., 396 F.2d 160 (5th Cir.1968). We therefore dismiss the cross-appeal.
 
 VI.
 
 55
 We AFFIRM the judgment of the district court on the merits of the main appeal. The plaintiffs' appeal of the award of costs is DISMISSED. The defendant's cross-appeal is DISMISSED AS MOOT.
 
 
 
 [1]
 Although appellate review is "somewhat broader" if the district court grants the motion, see Evers v. Equifax, Inc., 650 F.2d 793, 796 (5th Cir.1981), the decision will still be reversed only if the trial court abused its discretion. See Williams, 689 F.2d at 974 and n. 8; Rabun v. Kimberly-Clark Corp., 678 F.2d 1053, 1060-61 (11th Cir.1982)
 
 
 [2]
 In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc ), the Eleventh Circuit Court of Appeals adopted as precedent the decisions of the former Fifth Circuit issued before October 1, 1981
 
 
 [3]
 As the district court recognized, this omission also suggests an inconsistency in the verdict. The jury's ambiguous naming of "Plaintiff" as the prevailing party, coupled with the denial of damages to the child despite the undisputed evidence, raises the possibility that the jury found for the parents on their claim but for the defendant on the child's cause of action. Yet, under Florida law, the parents' claim is merely derivative of that of the infant. See, e.g., City Stores Co. v. Langer, 308 So.2d 621, 622 (Fla.Dist.Ct.App.), cause dismissed, 312 So.2d 758 (Fla.1975)
 
 
 [4]
 For example, on the second day of deliberations, the jury sent the following note to the trial judge:
 We have failed to reach a consensus as to whether or not Bendectin has better than even chance of causing the birth defects of David Mekdeci.
 The difference of opinion stems from the fact that there was testimony presented which indicated that any drug or chemical has a slight chance of causing birth defects, if ingested during the critical period of pregnancy.
 Trial Transcript, Vol. 76 at 8292 (emphasis in original). The next day, the foreperson communicated with the judge again:
 May we have part of the Dr. McBride [the plaintiffs' chief expert] testimony read back? We do not need that portion of the testimony which establishes Dr. McBride as an expert witness. We need that testimony which is germane to relationship of Bendectin and David Mekdeci's birth defects. This can be done after lunch.
 Trial Transcript, Vol. 77 at 8301. The jury's focus on this issue is not surprising in view of the sharply conflicting evidence presented at the trial. Briefly stated, Merrell's expert witnesses consistently denied that Bendectin was even a teratogen (a potential cause of birth defects). In contrast, the plaintiffs' experts maintained that the drug was not only teratogenic, but that it also caused David Mekdeci's particular injury. The major portion of the lengthy trial was devoted to this dispute.
 
 
 [5]
 That note stated:
 Is it possible or permissible to present a verdict with a rationale for such a verdict?
 We collectively feel that such a rationale for our decision is important in that it will be an admonition to one or both parties in this case. In the broad sense, these parties represent not only themselves, but a society in which they are an integral part.
 Trial Transcript, Vol. 78 at 8337.
 
 
 [6]
 See Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896)
 
 
 [7]
 Throughout the course of this appeal, the plaintiffs have repeatedly suggested that the district court sua sponte ordered a complete retrial. At the same time, they have not pointed to any specific legal error in the allegedly sua sponte nature of the ruling. Nor could they. See Fed.R.Civ.P. 59(d) ("the court of its own initiative may order a new trial for any reason for which it might have granted a new trial on motion of a party"). Moreover, an examination of the post-trial briefs discloses that the use of the term sua sponte may be somewhat of a misnomer in this case. In its response to the plaintiffs' motion for a partial new trial, Merrell argued that the verdict represented a compromise, but urged the court to leave it intact in order to avoid a costly new trial. However, the defendant alternatively maintained that if the court decided to grant a new trial, the retrial should cover all issues
 
 
 [8]
 At that hearing, the district court also referred to Belli's alleged statements to the London press and inquired whether the lawyers were merely deserting their clients in order to move on to potentially more profitable Bendectin cases. Cohen, speaking for the counsel of record, vigorously denied the suggestion
 
 
 [9]
 Throughout that discussion, Cohen obstructed the proceedings at every possible juncture. Each time the Charfoos attorney attempted to explain to the court the different strategy he would pursue, Cohen objected primarily on the grounds that the court had not yet denied his request to discuss his group's reasons for withdrawal in camera. Even after the court reminded him that the grounds for a possible continuance had absolutely no bearing on the justifications for withdrawal, Cohen persisted in his attempt to silence the other attorney. His conduct prompted the court to threaten to bar him from the courtroom. At one point, Judge Hoffman warned him either to cease interfering or to "stay in the case."
 
 
 [10]
 This motion did not mention Tobin, the remaining attorney of record. Nonetheless, Tobin filed a separate motion soon afterward praying for the same relief. By this time, Tifford had apparently left Tobin's firm
 
 
 [11]
 In addition to the mandamus petition, the lawyers also filed a regular appeal challenging the district court's refusal to allow them to withdraw. The appeal was subsequently dismissed as moot, following the completion of the second trial. Mekdeci v. Merrell National Laboratories, Inc., 664 F.2d 295 (11th Cir.1981)
 
 
 [12]
 The pendency of the original attorneys' motion to withdraw, at the time the Charfoos firm requested the continuance, does not alter that conclusion. In a civil case, a lawyer's withdrawal, much less a mere motion to withdraw, does not afford the party an absolute right to a continuance. See Washington v. Sherwin Real Estate, Inc., 694 F.2d 1081, 1088 (7th Cir.1982); Butterman v. Walston & Co., 387 F.2d 822, 823 (7th Cir.1967), cert. denied, 391 U.S. 913, 88 S.Ct. 1806, 20 L.Ed.2d 652 (1968). Grunewald v. Missouri Pacific Railroad Co., 331 F.2d 983, 986 (8th Cir.1964). Rather, the decision is still left to the trial court's discretion. See Grunewald, 331 F.2d at 986; see generally Annot., 48 A.L.R.2d 1155, 1157-1158 (1956). We recognize that, at least in some instances of withdrawal, the interests of justice may require granting successor counsel further time to prepare for trial. However, even the legitimate need for preparation does not translate into an unconditional right to set one's own trial date. In this case, the trial court concluded, and we agree, that five months was a sufficient period of time for the Charfoos firm to ready itself for the retrial. Given that determination, the outstanding motion to withdraw did not give the Detroit lawyers the leverage to demand any trial date of their choice
 
 
 [13]
 The Supreme Court of Florida has adopted the Model Code of Professional Responsibility. See 235 So.2d 723 (1970); Florida Bar Rules, Fla.Stat.Ann. Vol. 32 (West Supp.1982)
 
 
 [14]
 In this argument, the plaintiffs rely upon D.R. 2-110(C)(1)(d), which allows an attorney to seek withdrawal if the client "renders it unreasonably difficult for the lawyer to carry out his employment effectively." Although that ground is merely a possible basis for permissive, and not mandatory, withdrawal, the Mekdecis suggest that the alleged conflict was so severe in this instance as to require withdrawal under this provision
 
 
 [15]
 While some courts have suggested that a client's refusal to follow his attorney's advice may justify withdrawal in every instance, see, e.g., Spero v. Abbott Laboratories, 396 F.Supp. 321, 323 (N.D.Ill.1975), we reject the implication of those decisions, as did the panel in Singleton, that a party must blindly acquiesce in every recommendation made by his attorney
 
 
 [16]
 Nor does the attorneys' professed inability to meet that responsibility somehow transform a proper contractual obligation into an impermissible financial stake. Also, based on the record before it, the district court had ample reason to share Mrs. Mekdeci's doubt about the veracity of that allegation
 
 
 [17]
 Fisher v. State, 248 So.2d 479 (Fla.1971) is not to the contrary. There, the court held that Florida trial judges do not have
 the power to compel an attorney to continue in the representation of a party when he complies with rules for withdrawing or gives due notice to his client of his intention to withdraw, unless unusual circumstances exist which would interfere with the orderly processes of the Court.
 
 
 [248]
 So.2d at 484 (emphasis in original). Finding no such "unusual circumstances" in the case before it, the court emphasized that "[t]he case had not been scheduled for trial and there remained ample time for the clients to procure new counsel to handle the case." Id. at 486. On that basis, the court determined that the withdrawal request should have been granted
 We have some doubt whether the Fisher holding is binding on a federal court sitting in a diversity action, since it essentially defines the supervisory power of the state's trial courts, a matter which is primarily procedural. See id. at 484. In any event, we need not decide that question. The Fisher court's interpretation of "unusual circumstances" generally parallels the standards employed by the federal courts. See Broughten, 634 F.2d at 882-83; SEC v. International Scanning Devices, Inc., 415 F.Supp. 3, 4 (W.D.N.Y.1974); Garner v. Pearson, 374 F.Supp. 591, 600 (M.D.Fla.1974); Goldsmith v. Pyramid Communications, Inc., 362 F.Supp. 694, 696 (S.D.N.Y.1973) (withdrawal should be denied in "situations where the client's rights will be prejudiced by the delay consequent on replacing counsel and cases where the trial calendar of the Court will be dislocated, so as to impede the interests of justice."). In this instance, the risk that the plaintiffs could not retain successor counsel, their repeated efforts to block the withdrawal attempt, and the substantial possibility that withdrawal would disrupt the protracted proceedings constitute extraordinary circumstances warranting a denial of the motion even under Fisher.
 
 
 [18]
 At the hearing on August 29, 1980, both Mr. and Mrs. Mekdeci stated on the record their opposition to the motion. When Cohen, Kokus, Tifford, and Eaton renewed their motion, the Charfoos firm wrote to the district court to convey the Mekdecis' continued objection to the attempt. In a November, 1980 letter to the Fifth Circuit Court of Appeals concerning the attorneys' petition for a writ of mandamus, the plaintiffs reiterated their opposition. The first and only indication that the Mekdecis might be changing their attitude occurred when they submitted a brief to the Fifth Circuit on the lawyers' appeal, midway through the second trial. There, they suggested that the district court erred in failing to grant a continuance at the time the lawyers claimed an inability to finance the new trial. Of course, this argument contradicted their position at the January 12, 1981 hearing, where they insisted that the trial stay on its scheduled course
 
 
 [19]
 The former Fifth Circuit has recognized that a civil litigant has a constitutional right, inherent in the concept of due process, to retain counsel. Potashnick v. Port City Construction Co., 609 F.2d 1101, 1118 (5th Cir.), cert. denied, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980); see also Mosley v. St. Louis Southwestern Railway Co., 634 F.2d 942, 945 (5th Cir.), cert. denied, 452 U.S. 906, 101 S.Ct. 3032, 69 L.Ed.2d 407 (1981). However, "the right does not require the government to provide lawyers for litigants in civil matters." Potashnick, 609 F.2d at 1118. Nor does it encompass any assurance that the counsel retained will be effective. See White, 589 F.2d at 1285 n. 4
 
 
 [20]
 More specifically, Merrell attacks the proof adduced to establish (1) that Bendectin is a teratogen (a potential cause of birth defects), and (2) that the drug was the proximate cause of David Mekdeci's injury
 
 
 [21]
 At oral argument, Merrell conceded that its cross-appeal would be moot if this court affirmed the district court on the issues raised by the plaintiffs