Aniedi ABASIEKONG, Appellant,

v.

CITY OF SHELBY and David Wilkison, Individually and in his capacity as City Manager, Appellees.

No. 83–1598.

United States Court of Appeals, Fourth Circuit.

Argued April 5, 1984.

Decided Sept. 27, 1984.

John W. Gresham, Charlotte, N.C. (Jonathan Wallas, Chambers, Ferguson, Watt, Wallas & Adkins, P.A.; George Daly, Charlotte, N.C., on brief), for appellant.

Raboteau T. Wilder, Jr., William E. Moore, Jr., Gastonia, N.C. (Mullen, Holland & Cooper, P.A., Gastonia, N.C., on brief), for appellees.

Before WIDENER, PHILLIPS and MURNAGHAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

Appellant Aniedi Abasiekong, a Nigerian-born black, originally sued his employer, the City of Shelby, North Carolina, and City Manager David Wilkison, alleging that his discharge from the position of Director of the City Housing Department violated 42 U.S.C. §§ 1981 and 1983.[1] Seeking both

---

1. 42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State ... to make and enforce contracts, to sue, be parties, give

compensatory and punitive damages, Abasiekong contended that his discharge was racially motivated and was accomplished through a denial of due process, since he was terminated without a hearing and under stigmatizing conditions. At a jury trial begun on December 9, 1982, the district court dismissed Abasiekong's due process and punitive damages claims, but permitted the claim of racial animus to go to the jury. When a four and one-half hour deliberation resulted in a deadlocked jury, the district court declared a mistrial.

A second trial on February 10, 1983 resulted in a verdict against the City and Wilkison for $10,000.00 in compensatory damages on the basis of discriminatory discharge.[2] Relief was not immediately forthcoming, however. Reasoning that Abasiekong had failed to establish a *prima facie* case of racial discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the district judge found the verdict to be against the clear weight of the evidence and granted the defendants' motions for a new trial and judgment notwithstanding

the verdict.[3] Reviewing the case in light of this Court's decision in *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241–42 (4th Cir.1982), that, in assessing the sufficiency of the evidence to support a jury verdict, the reviewing Court is to look for a "reasonable probability" or "substantial probability" that a discriminatory motive caused the discharge, we hereby reverse the judgment of the district court and order reinstatement of the jury verdict for Abasiekong.[4]

The evidence before the jury revealed that, when Abasiekong was first appointed Director of Housing in early 1978, he was the only black City employee holding a position at the Director level. It is uncontested that around March 1978, he had certain Department employees deliver mulch to his home in a City truck, and had at least four employees go to his home to perform various household repair services on two separate occasions. At the time of those incidents, there was no written City policy regarding the personal use of municipal vehicles, and no oral policy had ever been communicated to Abasiekong.[5]

---

evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...."

42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...."

2. At the second trial, the district court again dismissed Abasiekong's due process claims and held that punitive damages were improper. Abasiekong agreed at oral argument that, should this Court reinstate the jury verdict, he would waive any claims on the issues of due process and punitive damages. Given our resolution of the claim for compensatory damages, it thus becomes unnecessary to address the issue of punitive damages or to determine whether Abasiekong's discharge constituted a denial of due process under the City's personnel rules.

3. Fed.R.Civ.P. 50(b) provides that "a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered

in accordance with his motion for a directed verdict.... A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative."

Fed.R.Civ.P. 59(a) permits that a new trial be granted "in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law...."

4. Although *Lovelace* concerned the application of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*, its test for evidentiary sufficiency of proof on the issue of motivational cause is also applicable to Abasiekong's case of racial discrimination. *Cf. Loeb v. Textron, Inc.*, 600 F.2d 1003, 1010 (1st Cir.1979) (seminal case extending the "operative principles behind *McDonnell Douglas*" to Age Discrimination in Employment cases as well as to Title VII cases).

5. City Manager Wilkison himself testified that the City personnel rules had no "sections about company trucks," and that he had no "recollection of ever having talked with [Abasiekong] about this subject matter...." It deserves mention, however, that in general one need not be informed that certain activities manifestly improper are forbidden, before sanctions for delin-

Abasiekong was formally discharged on May 7, 1979 after Wilkison summoned him to explain whether he had arranged for a mulch delivery to his home and told Abasiekong he "had no choice" but to dismiss him when he admitted the delivery. Although Wilkison first issued a "Personal Action Form" indicating that Abasiekong had resigned from his position, he later admitted at trial that the reason was false and that Abasiekong had actually been fired. Indeed, after Abasiekong appeared before the Advisory Council for the Housing Department to plead his case against discharge, Wilkison himself had changed the form to indicate "dismissed," and decided in his own mind not to give Abasiekong any future job recommendations.[6]

In contrast to the treatment dealt Abasiekong, it appears that several white City employees enjoyed with complete impunity and some regularity the use of City vehicles and resources for personal activities. Here is the crux of our decision favoring Abasiekong. Had no disparate treatment favoring whites been established, the impropriety of diversion of public property to private use and enjoyment would doubtless have justified the termination of Abasiekong's employment. *See McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (Court acknowledges that a claim of racial discrimination may be maintained by whites who allege that they were fired for misappropriating employer's property, while a black employee similarly charged was not dismissed); and *Pacheco v. Advertisers Lithographing, Inc.,* 657 F.2d 191 (8th Cir.1981) (Court affirms a finding of no discrimination when there was "no evidence that other employees had threatened [the employer] and not been suspended").

Specifically, there was evidence before the trial court that City garage personnel "worked on" Wilkison's Volvo at the City garage, Public Utilities Department Head Hugh Humphries used a City truck to carry mulch to his farm and had his personal car steam-cleaned at the City garage, clerk typist Elizabeth Nanney had her tires changed and car washed by City garage personnel, and Housing Department classified laborer Hoyt Brooks used the City truck on a regular basis to take his wife to work. None of the white employees were disciplined or otherwise visited with sanctions because of those activities.

Moreover, evidence was presented that Wilkison had advised Abasiekong to "be careful ... how [he] talked to white ladies," and told him after he appeared before the Advisory Council that "he would have advised [him] not to come to that meeting, and since [he] was there, he would not give [him] any further recommendations to get another job." Although she herself denied having made the statement, there was testimony that Ms. Mary Cole, a white, the Administrative Assistant who worked in close conjunction and in a semi-supervisory position with Wilkison, stated to Humphries after Abasiekong was fired, "I finally got it accomplished, what I've been trying to do a long time. *We* fired the nigger." (Emphasis added). Humphries himself twice asked, "What's that [damned] nigger doing down here?" when Abasiekong appeared in Humphries' Public Utilities Office, and warned his clerk, "I told you not to talk to that damned nigger again, and if I catch you talking to him again, you can go home."

From this evidence, the jury could well have concluded that Abasiekong was singled out for discriminatory treatment because of his race. Although Wilkison de-

---

quent behavior may be imposed. *See generally Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Supreme Court acknowledges the viability of a previously unrecognized cause of action for monetary damages against federal agents who allegedly conducted a patently unreasonable search of plaintiff's home).

**6.** Wilkison stated that he was "never asked to give him a recommendation by anybody," despite the fact that Abasiekong testified that he applied for "sixty to a hundred" jobs after he left the Department.

nied at trial that he had consulted directly with Cole about discharging Abasiekong, a review of the full trial record leaves the clear impression that Cole, Wilkison, and perhaps Humphries each desired to see Abasiekong fired and reveled in the event when it came to pass.[7]

Analtyically, Abasiekong's claims under 42 U.S.C. § 1981 and § 1983 may be reviewed under the *McDonnell Douglas* three-step format, requiring 1) that Abasiekong establish a *prima facie* case of discrimination, 2) that the Appellees be given the opportunity to rebut by articulating a legitimate, non-discriminatory reason for his discharge, and 3) that Abasiekong finally have the opportunity to show pretext: "the *McDonnell Douglas* criteria apply equally to cases arising under Title VII or § 1981." *Lewis v. Central Piedmont Community College*, 689 F.2d 1207, 1209 n. 3 (4th Cir.1982), *cert. denied*, 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792 (1983) (Court reverses judgment for plaintiff alleging racial discrimination; defendant established that a white applicant was better qualified for the position and that race did not motivate the decision not to promote plaintiff).

■ While it is true that the mulch and home repair incidents would suffice as legitimate, non-discriminatory reasons for discharging Abasiekong, evidence abounds to show pretext. Even conceding that the ultimate burden of persuasion remained at all times with Abasiekong, *see Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981) (burden of proving pretext "merges with the ultimate burden of persua[sion]"; a plaintiff may prevail "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence"), he did produce sufficient evidence that both Wilkison individually and the City as an entity terminated him because of his race.

■ To be sure, most of the evidence is indirect,[8] but the evidence outlined above readily supports the jury's conclusion that the Appellees did, in fact, intentionally discriminate against Abasiekong on the basis of race. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977) (in order to show a violation of the equal protection clause, plaintiff must prove a racially discriminatory purpose). While the City may not be held liable under 42 U.S.C. § 1983 merely upon a theory of *respondeat superior*, the actions of Wilkison, Cole, and Humphries establish a "governmental 'custom' even though such custom has not received formal approval through [the City's] official decisionmaking channels." Thus, the municipality may be held liable. *Monell v. Department of Social Services of New York*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–2036, 56 L.Ed.2d 611 (1978). Although evidence of discriminatory intent on the part of Wilkison is less pronounced, his advice to Abasiekong about how to talk to "white ladies" and his close mediation with Cole and Humphries do suffice to support the jury's finding of intentional discrimination on his part. *See General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982) (in order to recover under 42 U.S.C. § 1981, a plaintiff must prove intentional discrimination equivalent to that required to show a violation of the equal

---

7. The notion of "collective action" to see to it that Abasiekong was fired is strengthened by evidence that Cole's position was that of a virtual go-between, signing termination notices upon Wilkison's orders and telephoning among City offices about Abasiekong. Aside from their routine telephone calls, Humphries and Wilkison met two or three times each month for discussions during the working day.

8. The Supreme Court has recently reemphasized that indirect evidence may alone suffice to prove discriminatory intent. *See United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) (although a claimant must prove intent to discriminate to recover under Title VII, the trier of fact may inquire into a defendant's state of mind to ascertain intent by indirect evidence).

protection clause); and *Whiting v. Jackson State Univ.*, 616 F.2d 116 (5th Cir.1980) (in order to establish a violation of the equal protection clause and recover under § 1983, a plaintiff must prove a racially discriminatory purpose or motive).

In reversing the district court's grant of a judgment n.o.v. and a new trial, this Court is guided by the principles articulated in *Mays v. Pioneer Lumber Corp.*, 502 F.2d 106 (4th Cir.1974), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1125, 43 L.Ed.2d 398 (1975). In *Mays*, the Court adopted the view expressed in 5A Moore's Federal Practice § 50.14 at 2382 (2nd ed. 1974), that "where the judgment n.o.v. is reversed and the trial court has alternatively granted the motion for a new trial, the case will ordinarily be remanded for a new trial, '[b]ut the courts of appeals have authority to order otherwise.'" (Emphasis added). The Court then proceeded to reverse the district court's grant of a judgment n.o.v. and remanded with instructions to reinstate the verdict, since judicial efficiency would ill be served by permitting a third trial. Like the plaintiff in *Mays*, Abasiekong has also endured a first trial resulting in a hung jury and a second trial resulting in a judgment n.o.v.; and again, "two trials are enough, and indeed, all that the judicial system can presently afford." *Id.* at 110.

It is true that this Court has indicated its willingness to affirm the grant of a judgment n.o.v. as an appropriate "jury control device" when, in the absence of a "reasonable probability" or "substantial probability" of discriminatory motive, a jury has rendered its decision for a plaintiff on the basis of "sheer speculation." *Lovelace*, 681 F.2d at 242. By contrast, the verdict for Abasiekong reveals no juror speculation. The evidence permitted a reasoned conclusion resulting from careful consideration of the direct and indirect indicia of discrimination on the part of the City and Wilkison. Since a judgment n.o.v. is to be reversed if, "giving [the non-movant] the

benefit of every legitimate inference in his favor, there was evidence upon which a jury could reasonably return a verdict for him," *Mays*, 502 F.2d at 107, the judgment n.o.v. in Appellees' favor must be reversed.

In ruling on Appellees' motion for a new trial, the district judge was permitted to "weigh the evidence and consider the credibility of the witnesses," and was required to grant a new trial "if he [were] of the opinion that the verdict [was] against the clear weight of the evidence, or [was] based upon evidence which [was] false or [would] result in a miscarriage of justice ...." *Wyatt v. Interstate & Ocean Transport Co.*, 623 F.2d 888, 891–92 (4th Cir.1980), *quoting Williams v. Nichols*, 266 F.2d 389, 392 (4th Cir.1959). Although the action of a district court in granting a new trial is to be reversed only upon a showing of abuse of discretion,[9] the district court does appear to have abused its discretion in Abasiekong's case. The jury's verdict was not against the clear weight of the evidence, and any "miscarriage of justice" is more seriously threatened by forcing Abasiekong through the rigors of yet a third trial than by allowing the jury verdict to stand. *See Lind v. Schenley Industries, Inc.*, 278 F.2d 79, 88–91 (3rd Cir.1960) (a trial judge should not "denigrate" the jury system by granting a new trial on grounds of insufficient evidence and substituting his own judgment of the facts and witness credibility, particularly when the subject matter of the trial is simple and easily comprehended by a lay jury).

The judgment of the district court is hereby reversed, and the cause remanded for reinstatement of the jury verdict in favor of Abasiekong.

REVERSED AND REMANDED.

---

**9.** *See United States v. Horton*, 622 F.2d 144, 147 (5th Cir.1980) (per curiam) ("the grant or denial of a motion for a new trial is within the sound discretion of the trial court and will not be disturbed absent a clear showing of abuse of discretion").