940 F.2d 652
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Wayne R. GRIES, Michael J. Moran, Plaintiffs-Appellants,
v.
ZIMMER, INCORPORATED, Defendant-Appellee.
 No. 90-2430.
 United States Court of Appeals, Fourth Circuit.
 Argued May 9, 1991.
Decided July 29, 1991.
As Amended Aug. 26, 1991.
 
 Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Robert D. Potter, District Judge. (CA-87-576-C-C-P, CA-87-577-C-C-P)
 Louis Adams Bledsoe, III, Robinson, Bradshaw & Hinson, P.A.C., Charlotte, N.C. (Argued), for appellant Moran; Richard A. Vinroot, Robinson, Bradshaw & Hinson, P.A., Charlotte, N.C. on brief.
 Louis L. Lesesne, Jr., Lesesne & Connette, Charlotte, N.C., for appellant Gries.
 Martin Nesbitt Erwin, Smith, Helms, Mulliss and Moore, Greensboro, N.C. (Argued), for appellee: Julianna C. Theall, Diane P. Bishop, Smith, Helms, Mulliss and Moore, Greensboro, N.C. on brief.
 W.D.N.C., 742 F.Supp. 1309.
 REVERSED AND REMANDED.
 Before MURNAGHAN and SPROUSE, Circuit Judges, and JOSEPH H. YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Two ex-employees, Wayne R. Gries and Michael J. Moran, sued their employer, Zimmer, Inc., for age discrimination after their jobs were terminated. After the initial trial ended in a mistrial because the jury could not reach a verdict, a second trial was held. The jury returned verdicts for the plaintiffs; however, it awarded damages of half the amounts requested. The district judge granted a motion for judgment notwithstanding the verdict and conditionally granted a motion for a new trial should that grant be reversed on appeal. The judge also denied the ex-employees' motion for amendment of the judgment to provide for reinstatement in employment, pre-judgment interest, and an increase in damages. The ex-employees have appealed. We reverse the judgment notwithstanding the verdict, deny the motion for a new trial, and reinstate the jury's verdict. We affirm, however, the denial of the motion to amend to provide reinstatement and an increase in damages. We grant the motion for prejudgment interest.
 
 I.
 
 2
 Prior to April 6, 1987, Gries and Moran worked for Zimmer, a wholly-owned subsidiary of Bristol-Myers Squibb, with headquarters in Warsaw, Indiana. Zimmer manufactures orthopaedic devices and surgical supplies. Gries and Moran worked in Charlotte, North Carolina at Zimmer's Patient Care Division ("Patient Care"). Gries was Vice-President of Finance; Moran was Vice-President of Operations. Gries was 40; Moran was 44. Gries had been with Zimmer since 1979 as Budget Director and with Patient Care since 1984; Moran had been with Zimmer since 1975 as Manufacturing Controller and with Patient Care since 1980, first as Vice-President of Finance and then as Vice-President of Operations. The President of Patient Care, Robert Teskey was 53. All three men were members of Patient Care's seven-person management committee.
 
 
 3
 On April 6, 1987, the three men, Gries, Moran, and Teskey, were terminated by Ronald Davis, the President of Zimmer's United States operations. The propriety of the reasons for their termination is the principal subject of the instant lawsuit. Undisputed, however, is the fact that the three men's termination coincided with the consolidation of Patient Care and another Zimmer division.
 
 
 4
 Thoughts of consolidation dated to the spring of 1986, when Davis began to consider combining Patient Care, Aspen Laboratories in Colorado, Snyder Laboratories in Ohio ("Snyder"), and Hall Surgical in California into two divisions. In May and June 1986 the Senior Vice President of Finance at Zimmer, Jack Shinneman, prepared a report on the proposed consolidation. The report assumed that the consolidation would be effective October 1986 and that management structures would be combined. Davis received the report in June or July 1986.
 
 
 5
 At the end of July 1986, Davis also learned of inventory problems at Patient Care. Although, the precise cause and degree of severity is disputed, the problems basically arose from a computerized production order tracking system recently implemented in the division.
 
 
 6
 In October 1986, Davis received from M.L. Fisher, Vice President, Human Resources at Zimmer a "requested" memorandum entitled "PC/Snyder Thoughts." The memorandum outlined possible courses of action with respect to the three employees--termination and/or consolidation. Some time between August 1986 and January 1987, Davis added comments to Gries' and Moran's performance evaluations criticizing them for the inventory problems. By early spring 1987, Davis and Fisher had established the initial new management structure for the proposed consolidation of Patient Care and Snyder. It did not include the three men.
 
 
 7
 On April 6, 1987, the three men were told of their termination. Davis told them they had been terminated because of the consolidation. A claim of unsatisfactory performance was not asserted.
 
 
 8
 Snyder's managers were appointed to lead the consolidated Patient Care Division ("Division"). Snyder's former president, Charles Deeds (age 53) became the president of the Division. The other officers of the Division were Marley Price, Vice President/Controller (age 35); Thomas Egan, Vice President/Marketing (Snyder product line) (age 37); James Robson, Vice President/Marketing (Patient Care product line) (age 38); Phillip Sauer, Vice President/Product Development (age 48); J. Michael Hoban, Vice President/Human Resources (age 35); Regina Brown, Vice President/Quality Assurance (age 50); and R.G. Betts, Director, Manufacturing (age 41). Hoban and Robson had been members of Patient Care's management committee. Two other members of Patient Care's committee also were given new positions within the new Division: Glen Cueman, Director of Engineering (age 37); Eli Carter, Director of Quality Assurance (age 35). The Vice President of Operations position in the Division was offered to Thomas Hufziger (age 58) on a temporary basis from April 2, 1987 to July 27, 1987, at which time Larry Harvey (age 37) took over the position.
 
 
 9
 Gries and Moran claimed their termination was due to age discrimination. In December 1987, Gries and Moran filed suit under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. Secs. 621 et seq.[1] In March 1989, trial began in the United States District Court for the Western District of North Carolina before the Honorable Robert D. Potter, Chief Judge. The trial lasted five days, but ended in a mistrial when the jury was unable to reach a unanimous verdict.
 
 
 10
 In January 1990, the parties retried the case before Judge Potter and a jury in a seven-day trial. Gries sought damages of $111,702.21; Moran sought $81,080.88. The jury found for Gries and Moran, awarding damages of $55,851.10 and $40,540.44. Zimmer moved for judgment notwithstanding the verdict and a conditional grant of a new trial. Gries and Moran moved to amend the judgment to provide for reinstatement, pre-judgment interest, and an increase in damages to the full amount requested at trial. In the alternative, Gries and Moran moved for a new trial on the issue of damages.
 
 
 11
 On July 23, 1990, Judge Potter granted the motion for judgment notwithstanding the verdict and conditionally granted the motion for a new trial. The judge denied Gries' and Moran's motions. The appeal followed.
 
 II.
 
 12
 As in many discrimination cases, the parties tell two different stories using the same incidents and documents. Gries and Moran argue that in early 1986 Davis concluded that Zimmer would save money by eliminating three executive positions held by older employees with seniority who were highly paid and replacing them with younger persons who would be paid at a lower pay level. When problems with the computerized system at Patient Care arose in the summer of 1986, Davis used the inventory problems as the justification for the eventual elimination of these jobs during the consolidation. On the other hand, Zimmer contends that the decision to terminate the three men during the consolidation, rather than other personnel, occurred because Davis had lost confidence in the three men after the inventory problems arose.
 
 
 13
 Confronted with a motion for judgment notwithstanding the verdict, we apply the same standard as the trial court. The court must review the evidence "in the light most favorable to plaintiffs, giving them the benefit of all inferences." Duke v. Uniroyal, Inc., 928 F.2d 1413, 1417 (4th Cir.1991); Herold v. Hajoca Corp., 864 F.2d 317, 319 (4th Cir.1988), cert. denied, 490 U.S. 1107 (1989). "If, with that evidence, a reasonable jury could return a verdict in favor of plaintiffs, the court must defer to the judgment of the jury, even if the court's judgment on the evidence differs." Duke, 928 F.2d at 1417. We have "cautioned against granting motions for directed verdict and jnov in discrimination cases where motive and causation are at issue...." Herold, 864 F.2d at 319. As we have explained,
 
 
 14
 "Determination of motive is ordinarily a function within the purview of the fact finder because so much depends on an assessment of the credibility of the witnesses. A finding of motive should not be set aside by the reviewing court unless the evidence clearly compels rejection."
 
 
 15
 Id. (quoting Taylor v. Home Insurance Co., 777 F.2d 849, 854 (4th Cir.1985), cert. denied, 476 U.S. 1142 (1986)).
 
 
 16
 Two paths are open to a plaintiff alleging age discrimination under the ADEA. First, a plaintiff can meet the "burden 'under ordinary principles of proof by any direct or indirect evidence relevant to and sufficiently probative of the issue.' " EEOC v. Western Electric Co., Inc., 713 F.2d 1011, 1014 (4th Cir.1983) (citation omitted); see Goldberg v. B. Green and Co., Inc., 836 F.2d 845, 848 (4th Cir.1988); English v. Pabst Brewing Co., 828 F.2d 1047, 1051 (4th Cir.1987). However, because "it is difficult to prove discriminatory intent under ordinary principles of proof," Goldberg, 836 F.2d at 849, a plaintiff can use a judicially-created proof scheme established under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) for Title VII cases. See Herold, 864 F.2d at 319. By choosing that path, the plaintiff first must establish a prima facie case of age discrimination. The burden then shifts to the defendant to "articulate a nondiscriminatory reason" for terminating the plaintiff. Finally, the plaintiff "must bear the burden of proving that he was the victim of intentional discrimination" by "demonstrating that the defendant's proffered reason was a mere pretext and that, as between the plaintiff's age and the defendant's explanation, age was the more likely reason for the dismissal." Herold, 864 F.2d at 319.
 
 
 17
 We face, in the present instance, a particular type of ADEA case, namely, a reduction-in-force situation. In reduction-in-force cases, the requirements for the prima facie case have been further elucidated. In Herold, the court stated that
 
 
 18
 In a reduction-in-force case ... the plaintiff must show four things to make out a prima facie case under ADEA: (1) that he is in the protected age group, (2) that he was discharged, (3) that at the time of the discharge, he was performing his job at a level that met his employer's legitimate expectations, and (4) that persons outside the protected age class were retained in the same position or that there was some other evidence that the employer did not treat age neutrally in deciding to dismiss the plaintiff.
 
 
 19
 Herold, 864 F.2d at 319; see Western Electric, 713 F.2d at 1015.
 
 
 20
 Recently, in Duke, the court reconsidered the Western Electric/Herold analysis for situations "where legitimate business reasons led to a reduction of employees in an identified group or territory and the stated criterion for selection was employee performance...." 928 F.2d at 1418. In such cases,
 
 
 21
 we hold that, to prove a prima facie case, the plaintiffs must establish that: (1) they were protected by the ADEA; (2) they were selected from the group or territory for termination; (3) they were performing at a level substantially equivalent to the lowest level of those retained in the group or territory; and (4) the process of selection produced a residual work force of persons in the group or territory containing some unprotected persons who were performing at a lower level than that at which the plaintiffs were performing.
 
 
 22
 Id. at 1418. If such a case is established, "the employer may articulate a legitimate nondiscriminatory basis of selection, in which case the plaintiff bears the burden of demonstrating that the employer's basis was a mere pretext for discrimination and that age was a determining factor in the selection process." Id.
 
 
 23
 When Gries and Moran were terminated, the sole reason given by Zimmer was the Patient Care/Snyder consolidation. The notice sent to all Patient Care employees stated that Moran's and Gries' positions were "redundant in the new organizational structure." Davis assured both men that the termination was not due to their unsatisfactory performance. Even upon inquiry from the North Carolina Employment Security Commission and the EEOC, Zimmer maintained that economic consolidation had been the reason for their termination. Only after litigation had begun did Zimmer assert that unsatisfactory performance was an actual reason for termination.
 
 
 24
 Duke, therefore, does not apply here. Duke only applies where "the stated criterion for selection was employee performance." 928 F.2d at 1418. But Zimmer never stated to Moran and Gries that the criterion for termination was performance. Instead, at the time the men were terminated, redundancy because of the reorganization was the reason given. Unsatisfactory performance as a proffered rationale for termination arose only during the subsequent litigation. The reasons told to an employee at termination may be considered background to the prima facie case. The purpose of the prima facie case is to eliminate "the most common nondiscriminatory reasons for the plaintiff's rejection." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). Thus it may be permissible to heighten the prima facie requirements for a plaintiff, basing them on reasons that the plaintiff should examine prior to his or her conclusion that age discrimination has occurred and the subsequent decision to bring a lawsuit. Yet, it would be inappropriate to raise the plaintiff's burden to establish the prima facie case when it is based on reasons advanced by the defendant in response to the complaint which are in contradiction of those given at the time of termination. Such explanations "frame the factual issue," Burdine, 450 U.S. at 325, and explanation of the discrepancy should be part of the defendant's burden to produce a legitimate non-discriminatory reason. As elucidated in Western Electric and Herold, the third prong of the traditional test requires the plaintiff to establish that the reasons advanced by the employer are pretextual. That burden on the plaintiff suffices. We, thus, examine whether Gries and Moran proved their case under the analysis set forth in Herold and Western Electric.[2]
 
 A.
 
 25
 Gries and Moran first had to establish a prima facia case of age discrimination. See Herold, 864 F.2d at 319. Both men were over forty and thus in the protected age group. 29 U.S.C. Sec. 631(a); see Herold, 864 F.2d at 319-20; see also Connell v. Bank of Boston, 924 F.2d 1169, 1172 (1st Cir.1991), petition for cert. filed (April 26, 1991) (No. 90-1646). Both men were discharged. Herold, 864 F.2d at 319.
 
 
 26
 And, at the time of their discharge, both men were performing "at a level that met ... [their] employer's legitimate expectations...." Herold, 864 F.2d at 319. Despite the summer 1986 inventory problem, Zimmer assigned 1986 end-of-the-year evaluations to Gries and Moran which fell in the "effective" range. "Effective" is defined by Zimmer as "meets the requirements, goals and objectives of the position." A November 1986 Executive Succession Planning Chart completed by J. Michael Hoban, Personnel Director of Patient Care, gave Moran a "4" ("exceeds requirements") and Gries a "3" ("meets requirements") in the "Current Performance Rating" category. Moran and Gries also presented evidence that the inventory problem was the result of insufficient time to establish a complex product tracking system and that other people who had examined the problem believed it to have been largely addressed by Patient Care. Patient Care's Engineering Director, Glenn Cueman even testified that he believed he had borne identical responsibility for the inventory problem as Moran and yet Moran had been terminated while Cueman was rated "totally effective" and retained. Considered in the light most favorable to the plaintiffs, Moran and Gries established that they were performing at a level that met Zimmer's legitimate expectations.
 
 
 27
 The fourth element of the prima facie case, as the Duke court recognized, "often proves difficult to apply." 928 F.2d at 1418. Nevertheless, a plaintiff establishes a prima facie case by showing that the "employer treated an older worker differently than younger employees in similar positions" or produced "some other evidence indicating that the employer did not treat age neutrally." Herold, 864 F.2d at 320.
 
 
 28
 At trial and on appeal, the parties have debated which employees the court should examine to determine whether age was treated neutrally. Gries and Moran contended at trial that the seven-person Patient Care management committee was the proper focus for the court because only Patient Care's management was terminated or reassigned; only Teskey, Moran, and Gries, were terminated among the seven Patient Care committee members; and Teskey, Moran, and Gries were the only over-forty members of the committee. The district judge and Zimmer disagreed, arguing that the focus should be on all the management from Patient Care and Snyder, the divisions affected by the consolidation.
 
 
 29
 Cases cited with respect to the issue of which employees group the court should have examined are not dispositive and offer no guiding principles.[3] The consolidation itself, however, does offer guidance. Under the consolidation plan, Zimmer faced a choice of which personnel to eliminate. The issue for the court is whether, in choosing among personnel, Zimmer used impermissible criteria. The plaintiffs needed to prove that, when Zimmer confronted the need to dismiss people because of the consolidation, it dismissed older rather than younger people.
 
 
 30
 Prior to consolidation, the Snyder management committee consisted of eight people. Five were over forty: the President, Deeds, was 53; the Vice President for Product Development, Sauer, was 48; the Director for Quality Assurance, Hofacker, was 57; the Director of "Bio Lab," Brown, was 50; and the Director of Manufacturing, Betts, was 41. Of the remaining three, two--Egan and Hoffman--were 37, and one, Price was 35. The Patient Care management committee contained seven people. Three--Teskey, Moran, and Gries--were over 40. Robson was 38, Cueman was 37, and Carter and Hoban were 35.
 
 
 31
 The initial plan for the 1986 consolidation contained a series of organizational charts in which "redundant" positions were crossed out.[4] The organizational charts used were from Patient Care. Crossed out were Teskey, Moran, and Gries, as well as, Cueman, Robson, and Hoban.
 
 
 32
 However, Cueman, Robson and Hoban were not terminated while all 40 and over were. Robson and Hoban were given positions on the Division's management committee. Cueman and Carter were placed one level below the management committee. Similarly, all the Snyder committee members were retained, those over 40 and those under 40, although after consolidation some members, Hoffman and Hofacker, were technically one level below the Division management committee.
 
 
 33
 Therefore, although after the consolidation, four of the new Division's nine person management committee were over 50, all the under forty employees who had been members of the Patient Care and Snyder Management Committees were retained and the only terminated members were over forty.[5] In addition, prior to consolidation, Zimmer initially intended to eliminate three positions held by younger employees. Zimmer eventually maintained the younger employees. Furthermore, Gries and Moran presented evidence from other Zimmer employees that Gries' and Moran's duties, although not their titles, were given to two younger men.[6] Gries and Moran also have contended that they should have been allowed to bump junior employees. The evidence supporting their claim that Zimmer had such a practice as an official policy was somewhat questionable; however, in any case, they were not offered such an opportunity. Zimmer did not purge itself of all over-forty executives. But the plaintiffs need not prove total exclusion to meet the prima facie case. They need to prove only that age was not treated neutrally. They met such a burden and made out a prima facie case of discrimination.[7]
 
 B.
 
 34
 In response to the prima facie case established by Moran and Gries, Zimmer articulated a legitimate nondiscriminatory basis for selection beyond the elimination of their positions due to the consolidation. Zimmer claimed that Davis had "lost confidence" in Moran and Gries because of the inventory discrepancy in 1986. According to Davis, the inventory difference was initially over $800,000 and many of the identified causes of the discrepancy fell within Gries' and Moran's responsibilities. In addition, Zimmer argued that Davis had been concerned about internal bickering between Gries and Moran.
 
 C.
 
 35
 Presented with the inadequate performance explanation, Gries and Moran had to offer "substantial proof from which a reasonable jury could conclude that the articulated reasons were a pretext for age discrimination." Duke, 928 F.2d at 1418. In Duke, the court explained our task:
 
 
 36
 we act clinically in marshalling the evidence presented in favor of plaintiffs and disregard the substance of evidence offered by ... [defendant]. We also must assume that the testimony in favor of plaintiffs was credible, unless totally incredible on its face, and ignore evidence offered to rebut it.
 
 
 37
 Id. Under that standard, we believe that a reasonable jury properly could have found that Zimmer's stated reasons were pretextual. The key determinations required to decide the pretext issue involved credibility. "Determining witness credibility is the job of the jury." Herold, 864 F.2d at 320-21. The judge should not take that "task away from the jury" once the jury has decided which witnesses to believe. Id. at 321.
 
 
 38
 Three documents were essential to the trial. First, the parties disputed the authenticity of the 1986 evaluations of Gries and Moran. Teskey initially filled out those forms. He dated Moran's, July 30, 1986, and although no date by Teskey appears on Gries', Hoban dated his review of it as December 1, 1986. At a disputed date after the end of July, Davis added a comment on both evaluations relating to the inventory problems. Davis also refused to give the men a salary increase at the end of the year. Gries and Moran have claimed that Teskey's testimony demonstrated that Davis added the comments long after he had decided to terminate them. Teskey testified that at the "end of the year"--December 1986--he and Davis discussed the evaluations and Davis said that he wanted "to write a comment." In addition, at deposition Davis stated that he had added the comments after August 1986. Zimmer, however, has claimed that Davis added the comments around August 27, 1986.
 
 
 39
 Second, the parties offer different interpretations of an October 17, 1986 memorandum. The memorandum was prepared by Fisher on the PC/Snyder consolidation. The memo outlines three possible courses of action. One, "Consolidate PC into Snyder," details severing only Teskey, Moran, and Gries. The second, "Do Not Consolidate But Review the Three Employees in Six Months," provided "Performance appraisals (review and rework with Legal)." The third, "Terminate," discussed the termination only of Teskey, Moran, and Gries. Gries and Moran claimed that Davis, following part of the second step, had "reworked" the reviews by later adding in December or January the inventory comments to their evaluations. Zimmer argued that no such nefarious connotation was intended by the term, "reworked," and the memorandum and reviews were separate.
 
 
 40
 Third, the parties drew conflicting conclusions about two "Executive Succession Planning" charts. Teskey testified that, in October 1986, he and Hoban worked together and filled out an Executive Succession Planning chart. According to their chart dated November 24, 1986, all the management employees, including Gries and Moran, received current performance ratings of "4," "Exceeds Requirements." However, at trial another chart appeared, allegedly prepared in February 1987, which gives identical information for all personnel except Moran, Gries, and Teskey. Their ratings were displayed as "1," "Does Not Meet All Requirements." Gries and Moran argued that the February 1987 chart represented another alteration by Davis and Fisher to support the termination decision. Zimmer argued that the later document was not based on the earlier chart but rather prepared at the company headquarters by the personnel department and that Davis had not even known of the later chart.
 
 
 41
 In addition to presenting conflicting documents, Gries and Moran presented evidence that, aside from Davis and Fisher, few others at Zimmer were aware of the "severe" nature of the performance problems with the three men. They argued that the inventory problem was not as serious or substantial as Davis claimed. They claimed that Patient Care was asked to create a computer inventory system in a far shorter period of time than Zimmer itself had installed one, they were aware of the problem when it occurred, and they acted to attempt to resolve it. Reports introduced at trial, from December 1986 and March 1987, based on visits by Zimmer personnel to Patient Care suggested that matters with respect to the inventory had much improved. In listing the evidence, we do not imply that an incorrect but good faith belief as to the plaintiffs' competence constitutes proof of age discrimination. See Little v. Republic Refining Co., Ltd., 924 F.2d 93, 97 (5th Cir.1991). However, the evidence supports Gries' and Moran's contention that Zimmer's evidence about their performance did not reflect a good faith belief actually held by Davis. In addition, Gries and Moran presented evidence that the duties they had held had been largely reassigned to retitled positions that were given to men under forty. They also presented evidence that they were not offered the opportunity to fix their alleged performance problems, and, indeed were never even informed of any alleged deficiencies.
 
 
 42
 Credibility, in short, must resolve such conflicts. It is quintessentially a task for the jury. When viewed in the light most favorable to Gries and Moran, and when all reasonable inferences are drawn in their favor, the jury properly could have found that Zimmer's proffered reasons for dismissing Gries and Moran were mere pretexts and that it was more likely that age was the real reason. Herold, 864 F.2d at 320. If the jury had disbelieved Davis' testimony that he had "lost confidence" in the three men and therefore had decided to terminate them, it could have chosen to conclude, based on the evidence, that he had created a paper record to suggest that their termination had not been based on age discrimination. Although the district court's judgment of the evidence obviously differed, the jury's verdict based on the evidence was that of a reasonable jury, resting on substantial evidence. Judgment notwithstanding the verdict was, therefore, improper.
 
 III.
 
 43
 Having concluded that the grant of judgment notwithstanding the verdict was improper, we must proceed to decide whether the conditional grant of a new trial was also improper. We review the district judge's decision under an abuse of discretion standard. See Herold, 864 F.2d at 321. A "motion for a new trial differs from that of a motion for judgment notwithstanding the verdict in that the court must weigh the evidence and the credibility of the witnesses." Spell v. McDaniel, 604 F.Supp. 641, 647 (E.D.N.C.1985), aff'd in part and vacated in part, 824 F.2d 1380 (4th Cir.1987), cert. denied, 484 U.S. 1027 (1988); see Herold, 864 F.2d at 321.
 
 
 44
 Two principles inform our decisions. First, in Abasiekong v. City of Shelby, 744 F.2d 1055 (4th Cir.1984), the court reversed grants of judgment notwithstanding the verdict and new trial finding an abuse of discretion. It was concerned with judicial economy. The Abasiekong court explained that:
 
 
 45
 "where the judgment n.o.v. is reversed and the trial court has alternatively granted the motion for a new trial, the case will ordinarily be remanded for a new trial, '[b]ut the courts of appeals have authority to order otherwise. ' " (Emphasis added).
 
 
 46
 Id. at 1059 (quoting Mays v. Pioneer Lumber, 502 F.2d 106 (4th Cir.1974), cert. denied, 420 U.S. 927 (1975)) (emphasis in original). In Mays, the court reinstated the jury verdict because "judicial efficiency would ill be served by permitting a third trial." Id. The Abasiekong court followed suit:
 
 
 47
 Abasiekong has also endured a first trial resulting in a hung jury and a second trial resulting in a judgment n.o.v.; and again, "two trials are enough, and indeed, all that the judicial system can presently afford."
 
 
 48
 Id. at 1059 (quoting Mays, 502 F.2d at 110). The Abasiekong court concluded that, "the district court does appear to have abused its discretion.... The jury's verdict was not against the clear weight of the evidence, and any 'miscarriage of justice' is more seriously threatened by forcing Abasiekong through the rigors of yet a third trial than by allowing the jury verdict to stand." Id. In the present case, as in Abasiekong, the first trial ended with a hung jury and the second ended with a judgment notwithstanding the verdict. In trial time alone, the proceedings have consumed a total of twelve days of court time.
 
 
 49
 The second principle, advanced to justify the grant of a new trial, namely, the possibility of a compromise verdict, was adopted by the district judge as the basis for his decision. In Mekdeci By and Through Mekdeci v. Merrell Nat'l Laboratories, 711 F.2d 1510 (11th Cir.1983), the court stated that "a compromise verdict results when jurors resolve their inability to make a determination with any certainty or unanimity on the issue of liability by finding inadequate damages." Mekdeci, 711 F.2d at 1513. The court noted, however, that "an insufficient damages verdict, standing alone, does not necessarily indicate compromise." Id. The court examined "other evidence demonstrating that the deficient monetary award resulted from an impermissible compromise." Id. at 1514. The court listed "sufficiently persuasive indicia of a compromise":
 
 
 50
 "that the issues of liability were strongly contested, that there was some confusion on the part of the jury with regard to the contributory negligence issue, that the jury took two days to reach a verdict, and that neither party urged acceptance in the trial court of the verdict finally rendered."
 
 
 51
 Id. (quoting Hatfield v. Seaboard Air Line Railroad Co., 396 F.2d 721, 723 (5th Cir.1968)). The court then found that "unique circumstances provide abundant indicia that the jury compromised the issues of liability and damages...." Id. at 1515.
 
 
 52
 The Fourth Circuit has adopted a similar, although slightly more stringent, analysis. We have held that a new trial on all issues is necessary "if the verdict 'could only have been a sympathy or compromise verdict ... [b]ut where there is no substantial indication that the liability and damage issues are inextricably interwoven ... a second trial limited to damages is entirely proper.' " Spell, 824 F.2d at 1400 (quoting Great Coastal Express, Inc. v. Int'l Brotherhood of Teamsters, 511 F.2d 839, 846 (4th Cir.1975)) (emphasis in original). In Spell, the district court in an "eminently sound," 824 F.2d at 1400, ruling stated that the pertinent factors included,
 
 
 53
 (1) clarity of the jury instructions and verdict form; (2) length of the jury deliberations; (3) strength of the evidence as to liability; (4) questions and notes from the jury during deliberations; and (5) whether the case involved a sympathetic plaintiff and unsympathetic defendant.
 
 
 54
 604 F.Supp. at 651. The district court emphasized that "if inadequate damages were the sole test for compromise, Rule 59(a) would serve no purpose." Id. at 653. With respect to the facts at issue in Spell, the district court decided that the "totality of the circumstances simply does not point unerringly to a compromise verdict." Id.
 
 
 55
 In the present case, the district judge concluded that a compromise verdict had been rendered. He cited, and Zimmer has pointed on appeal, to a number of indicia of the alleged compromise verdict: the evidence of liability was insubstantial; the plaintiffs' counsel improperly attempted to invoke the jury's sympathies; the jury instructions on damages were clear; the jury may have wanted to resolve the issue to be finished that same day which was Friday, their last day of duty; the one communication from the jury about damages was immaterial; the damages were undisputed; the jury split the plaintiffs' damage claims exactly in half despite different post-employment histories; and both parties were dissatisfied with the jury's judgment.
 
 
 56
 We emphasize that "a jury's verdict is to be afforded every inference that it is proper and honest...." Spell, 604 F.Supp. at 651. We recognize that the decision that a verdict represents a compromise is "quintessentially a decision committed to the informed discretion of the judge who has conducted the trial...." Spell, 824 F.2d at 1400. However, after careful consideration, we believe that no new trial is required. Admittedly an award of precisely fifty percent of the requested amount raises suspicions; however, we do not believe that this fact alone can justify sending the case back for a third trial.[8] None of the other factors present in a compromise verdict situation appear here.
 
 
 57
 First, after a seven-day trial, the jury debated only three and one-half hours. As in Spell, the verdict was reached "within a reasonable period of time." 604 F.Supp. at 653; see Guaranty Service v. American Employers' Insurance, 893 F.2d 725, 729-30 (5th Cir.1990) (concluding that where evidence supports the verdict, a ten minute jury deliberation was of "no importance"). The district judge speculated that the jury had been influenced by its receipt of the case on "a Friday late in the afternoon on the last day for which they had been summoned to serve." However, we must presume that the jury acted properly and honestly. Spell, 604 F.Supp. at 651. We do not believe that the mere fact that a verdict is handed down on Friday afternoon means that it is, per se, a compromise verdict. Moreover, the district judge's instruction to the jury emphasized the importance of reasoned deliberation. Four times, he gave any member of the jury the opportunity to inform him that deliberation for "any reason " would not be possible. We must assume, absent evidence to the contrary, that a juror concerned about leaving by early evening, would have stepped forward. Furthermore, the jury gave no indication of being deadlocked or confused as to liability. In comparison, in Mekdeci, after four days, the jury attempted to render a decision with an explanation of its reasons. After being denied that request, the jury stated that it was hopelessly deadlocked, and the judge gave an Allen charge. A period of three and one-half hours of deliberation is as indicative of the jury's belief in Zimmer's liability as it is indicative of Zimmer's non-liability.
 
 
 58
 Second, as discussed in Part II, the evidence on liability, even now weighing the evidence and the credibility of the witnesses, was sufficient to preserve the possibility that a compromise verdict was not rendered.[9] Moreover, the jury's one note to the judge during its deliberation supports the argument that no confusion existed as to liability. The jury was instructed to decide the first issue, liability, and only upon finding liability to go on to determine damages. During deliberations, the jury sent a question to the judge. The judge noted upon receiving the jury's question, "All right. They have gotten past the first issue." The jury asked whether in calculating damages it should consider the bonus health plan and savings plan. This question implies that it rapidly decided liability but had difficulty deciding the proper amount of damages. Had the verdict been a compromise verdict, there would have been little need for the jury to debate which elements of damages it should include. In Mekdeci, the jury "sent several communications to the judge indicating its uncertainty on the central issue of causation." 711 F.2d at 1515. In the present case, as in Spell, "the jury communicated only once with the court and that communication was reasonable." 604 F.Supp. at 651. Certainly, no "odd chronology" of jury deliberations exists. Phav v. Trueblood, Inc., 915 F.2d 764, 768 (1st Cir.1990). Notably, the only confusion apparent on the part of the jury was over damages, the aspect that both parties argue the jury calculated incorrectly.
 
 
 59
 Third, Zimmer has argued that a verdict of precisely one-half the amount of requested damages in a case where liability is contested leads to the conclusion that the award represents a compromise verdict. In National Fire Ins. Co. of Hartford v. Great Lakes Warehouse Corp., 261 F.2d 35, 37 (7th Cir.1958), the court found a compromise verdict where the jury "awarded only one-half of the amount of loss as established by the undisputed evidence on this subject and under the court's instructions." However, here the damages evidence was not undisputed and the court's instructions left room for jury discretion. According even to the district judge, Zimmer argued in its closing argument that the plaintiffs had failed to mitigate their damages. The judge also gave an instruction regarding mitigation which stated that if the plaintiff "failed to make reasonable efforts to find a new job, you should subtract from his damages any amount that he could have earned in a new job after his discharge." The jury might have believed that, had damages actually been undisputed, it would not have been asked to decide upon an amount.[10] From the jury's perspective, such a conclusion would have appeared supported by the judge's instruction that the jury award should be "fair and just."
 
 
 60
 A "low award of damages can reasonably be explained by the jury's consideration of other improper factors," Spell, 604 F.Supp. at 651, or the low award can be the result of the consideration of proper factors, although not necessarily in the manner that counsel or the judge would have preferred. The evidence does not indicate what the jury was thinking when it determined that the appropriate damages would be half of, what even plaintiffs' counsel termed, a "lot of money." However, it was repeatedly told by plaintiffs' counsel and the judge not to base the award or decision on sympathy. We note also that, although Zimmer was a large company, Moran and Gries were well-to-do executives whose salaries and benefits over a thirty-three month period amounted each to over two hundred thousand dollars. As in Spell, "The record contains absolutely no indicia of a compromise other than the low amount of damages." Spell, 604 F.Supp. at 653. Cf. Sentry Indemnity Co. v. Peoples, 856 F.2d 1479, 1481 (11th Cir.1988) (mathematical relationship between unpaid policy limit and jury award did not show impermissible compromise).
 
 
 61
 In conclusion, the grant of a new trial was an abuse of discretion. The "telltale signs of a compromise verdict" are not present. The record in fact contains evidence--the jury's note--that the jury engaged in a calculation of damages based on proper factors. Damages, in view of the comments about mitigation, were not clearly inadequate. As in Abasiekong, the plaintiffs have already been through two trials. A third trial will do little to achieve anything closer to a just verdict than the one rendered. We reverse the new trial grant by the district court to uphold the jury's verdict on liability.
 
 IV.
 
 62
 The plaintiffs also have argued that the court should reverse the denial of their motions to amend the judgment to provide for reinstatement and pre-judgment interest, and adjust the damage award upward to the figure they claim was undisputed at trial. In the alternative, the plaintiffs moved for a new trial on damages.
 
 
 63
 As explained earlier, the damages were not undisputed at trial.[11] The district judge found that the damages were "virtually undisputed." (Emphasis added.) He found that the evidence concerning back pay and mitigation of damages "essentially was undisputed." (Emphasis added.) As we have explained in Part III, the evidence and the jury instructions may have led the jury to believe that a lower award would be permissible. The jury may have taken into consideration some perceived failure to mitigate on the part of the plaintiffs.
 
 
 64
 The damage awards are not "manifestly inadequate" in view of the disputed damages. Spell, 824 F.2d at 1400. They are not "too low to be sustained." Young v. Int'l Paper Co., 322 F.2d 820, 823 (4th Cir.1963). "Appellate review is not designed to rationalize jury verdicts, even if such a task were possible." Van Buskirk v. Carey Canadian Mines, Ltd., 760 F.2d 481, 489 (3d Cir.1985). Having concluded that the damages were somewhat disputed and that therefore the decision that a compromise verdict was rendered was an abuse of discretion, we likewise find that the jury award was not inadequate and a new trial solely on damages is not required.
 
 
 65
 Reinstatement and prejudgment interest are issues committed to the discretion of the courts. See Duke, 928 F.2d at 1423-25 (reinstatement); MacDissi v. Valmont Industries, Inc., 856 F.2d 1054, 1061 (8th Cir.1988) (prejudgment interest); Spagnuolo v. Whirlpool Corp., 717 F.2d 114, 120 (4th Cir.1983) (reinstatement); EEOC v. Liggett & Myers, Inc., 690 F.2d 1072, 1075 (4th Cir.1982) (prejudgment interest). The Duke court stated that, "notwithstanding the desirability of reinstatement, intervening historical circumstances can make it impossible or inappropriate." 928 F.2d at 1423. We find such circumstances present here. For example, although prolonged litigation may not always render reinstatement not feasible, in this case, the "animosity between the parties" that the litigation appears to have created makes reinstatement inadvisable. Id. We do not believe that equity would be served by reinstatement.
 
 
 66
 However, "[i]n an ADEA case, prejudgment interest is designed to compensate the plaintiff for loss of the use of money wrongfully withheld through an unlawful discharge." Reichman v. Bonsignore, Brignati & Mazzotta P.C., 818 F.2d 278, 281 (2nd Cir.1987). Equitable considerations lead us to grant prejudgment interest on the damage awards from April 6, 1987.
 
 
 67
 REVERSED AND REMANDED.
 
 
 
 [1]
 The EEOC and the North Carolina Employment Security Commission apparently were notified although nothing appears in the record as to what conclusion, if any, the entities reached
 
 
 [2]
 Because we conclude that Gries and Moran met their burden under the McDonnell Douglas proof theory, we do not consider in detail whether they also could have met their burden under ordinary principles of proof. Although we find the alleged link among age, seniority, and wage somewhat problematic, we believe the jury could have been influenced by the considerations that, as the only members of Patient Care's management committee who were terminated, the only members who were over forty, the only employees whose wages and benefits were based in part upon age, and the only employees who were not told about nor offered an opportunity to correct their allegedly poor performance or to replace junior employees, Gries and Moran might prevail. Cf. Cline v. Roadway Express, Inc. 689 F.2d 481 (4th Cir.1982) (finding age discrimination without reliance on the McDonnell Douglas theory)
 
 
 [3]
 For example, in Holzman v. Jaymar-Ruby, Inc., 916 F.2d 1298 (7th Cir.1990), the court permitted a chart listing changes in the sales force over one year. In Duffy v. Wheeling Pittsburgh Steel Corp., 738 F.2d 1393, 1395 n. 2 (3d Cir.), cert. denied, 469 U.S. 1087 (1984), the appellate court explained that even if personnel changes in the Philadelphia office, as opposed to the Philadelphia district, were examined, a prima facie case would have been made. In Berndt v. Kaiser Aluminum & Chemical Sales, Inc., 789 F.2d 253 (3d Cir.1986), the court examined a six person sales force for a specific region. In MacDissi v. Valmont Industries, Inc., 856 F.2d 1054 (8th Cir.1988), the court stated that there was nothing wrong with looking at statistics only from the department in which the employees were laid off and noted that "overly formal statistical descriptions" had obscured the "more obvious significance" of the termination of the two oldest employees in a department, leaving all but one other non-managerial employee 33 years old or younger. Id. at 1058. In Herold, the court wrote that the judge acted within his discretion in permitting statistics for the branch from which the employee was terminated and not the entire Mid-Atlantic region. 864 F.2d at 321. In Toth v. Square D Co., 712 F.Supp. 1231 (D.S.C.1989), the judge compared the percentage of employees over forty in the company before and after layoffs. Id. at 1239 n. 12. And in a recent First Circuit case, the court implied that the relevant body would be the entire bank. Connell, 924 F.2d at 1177
 
 
 [4]
 The notes to the charts referred to the fact that "the positions marked with an "X" would be considered redundant with one in the other division, and therefore eliminated.... [T]he status of specific individuals is not relevant to this study (e.g., Gries versus Price)."
 
 
 [5]
 Another member, Thomas Hufziger, was initially a member of the committee. He was 58. Zimmer claimed that although he was appointed in a temporary capacity, he was offered a permanent appointment but turned it down, thereby necessitating a search for a replacement shortly after the consolidation. The replacement, Harvey, was under 40. Gries and Moran, however, argued and advanced evidence that Zimmer knew all along that Hufziger would not want to relocate and would never accept the position. In addition, Gries and Moran showed that Zimmer had been conducting an outside search for the position prior to offering it permanently to Hufziger and that Zimmer offered it only after they learned of the possibility of an age-discrimination suit. Gries and Moran claimed that Zimmer initially offered the position to Jeff Aull, age 37. Construing the evidence in the light most favorable to the plaintiffs, we conclude that a finding by the jury was possible that Hufziger's position was also intended to be held by a younger man. Although Hufziger initially accepted the job, evidence showed that the job was initially only temporary, that Hufziger had lived in Indiana for twenty-five years and was not looking to move, that prior to making the permanent offer to Hufziger, Zimmer had begun an outside search for a candidate, and that the date of the permanent offer to Hufziger appears to have followed a May 12, 1987 letter from Moran to Davis (although Davis claims he never received it) raising the age discrimination issue
 
 
 [6]
 The plaintiffs argued that Gries' responsibilities were given to Kenneth Coonce (age 35) on a temporary basis and then to William Franko (age 37). They claimed Moran's responsibilities were given to Hufziger and then to Harvey
 
 
 [7]
 We note that, under Duke 's prima facie analysis, the plaintiffs have met their burden. Given the plaintiff's allegations that the 1986 and 1987 performance evaluations were filled out after the plan to terminate them was conceived and the presentation of some evidence to support such a theory, for purposes of the prima facie case we should not rely on those documents' suggestion that the men were performing at a "lower level," Duke, 928 F.2d at 1418, than the retained employees. At least one company document produced in November 1986, ranked Gries and Moran as performing comparable to, and Moran as performing far better than, some of the retained employees. They each had histories of generally favorable evaluations. And evidence at trial indicated that some employees believed the inventory incident to have been exaggerated in severity. Even if Duke applied, we would be obliged to find the evidence sufficient to permit the plaintiffs to survive the fourth prong of Duke 's prima facie analysis
 
 
 [8]
 We note that, while an amount of exactly fifty percent of that demanded raises suspicion, logically nearly every verdict will be some percentage of the amount claimed. Fifty percent may but need not represent an impermissible halving to reach a verdict
 
 
 [9]
 The judge found persuasive the prior jury's inability to reach a verdict. He noted that five of the six original jurors had concluded no liability was present. However, Moran and Gries have claimed that there is no evidence in the record that the prior jury actually had found five to one against liability. We have found in the record no support for the speculation about the prior jury's degree of separation
 
 
 [10]
 We note that both parties were given the opportunity to request a jury poll and both declined
 
 
 [11]
 Jones v. Wal-Mart Stores, Inc., 870 F.2d 982 (5th Cir.1989), permitting an upward increase in damages, is distinguishable because damages at issue in Jones were stipulated and "should never have gone to the jury." Id. at 985